[No. 24916. Department One. August 27, 1934.]

J. E. HOLMAN, *Respondent*, v. H. B. SPENCER *et al.*, *Appellants*.[1]

*James Zylstra,* for appellants.
*Edgar M. Swan,* for respondent.

MAIN, J.—By this action, the plaintiff sought injunctive relief. After a hearing, a temporary injunction was granted. Subsequently, the case was tried on the merits, and resulted in findings of fact from which it

[1]Reported in 35 P. (2d) 65.

was concluded that the plaintiff was entitled to a permanent injunction. From the judgment entered granting that relief, the appeal is prosecuted.

The respondent, J. E. Holman, was an unmarried man and a resident of Island county. The appellant H. B. Spencer resided in the city of Seattle and owned a ranch in Island county, consisting of something over three hundred acres of land, approximately seventy acres of which was in hay, one hundred acres in pasture, a portion was suitable for the planting and cultivation of crops, and the remainder was woodland.

Sometime during the early spring of 1933, the tenant who had been in occupancy of the ranch moved off. Spencer sent one I. A. Fay to do some summer fallowing thereon. While Fay was at the ranch, he became acquainted with Holman, and the latter desired to lease the ranch or a portion thereof on which he would plant oats and potatoes. The matter was submitted to Spencer, and he approved of the arrangement, by which he would furnish the seed and get one-half of the crop, Holman to do the work of preparing the ground, planting and harvesting the same.

Seventeen or eighteen acres were sowed to oats, and about two acres were planted to potatoes. Along with the oats, there was sowed grass seed. Holman did not see, or have any conversation with, Spencer until the latter part of May, when Spencer went to the ranch. As to what took place at this time, Holman testified:

"Q. You are familiar with the premises which you describe in the complaint, the ranch that is owned by Spencer here in Island county? A. Yes. Q. Now you may state whether or not during the month of May or about that time, this year, you had conversations with the defendant Spencer with reference to leasing that ranch? A. I did. Q. You may state briefly what those conversations were? A. Well, one of them, he came over on a Saturday night when I was plowing a

piece of ground for oats; he backed up everything that Mr. Fay said. Spencer said to go ahead with the place just the same as my own, that I was doing fine. Q. Prior to that time you had conversations, before you started to plow? A. I had conversations with Mr. Fay. . . . Q. Did you have any conversation with Spencer afterward with reference to what Fay had said? A. Yes. Q. What did he say about that? A. He said he backed up everything Fay said. Q. Now go ahead and tell the conversation you had with Fay or Spencer, either one, about your leasing the place? A. Fay and Spencer came down there—they were there together—Spencer told me to go ahead with the place just the same as if it was my own; they would fix up the fences and barn so that everything would be O. K. Q. What was said with reference to what part of the place you were to have? A. He told me all of it. Q. Was anything said with reference to the share that you were to have, the share of the crops? A. Mr. Fay told me one-half and Spencer backed him up and Spencer asked me if I could handle it on one-half and told him 'yes,' providing I got the whole place. . . . About the hay they told me to go ahead with the hay and figure on the whole place, and I told him providing I got the whole place I could handle the place on one-half and he even gave me permission to break down a certain piece of fence and the Holt boy was with me.''

Following this conversation, Spencer, on June 8, 1933, wrote Holman a letter which the latter says he received. The pertinent parts of the letter are as follows:

''In reference to our conversation of May 30th I wish to verify our understanding as to your position on my ranch. First, it is understood and agreed that you are to furnish all machinery, labor, horses, in fact all equipment to plant potatoes, oats and all other crops agreed upon. Your share to be one-half of the first crop only, the writer is to furnish all seed and receive one-half of the first crop and all of the second or thereafter. I also reserve all rights to the house for myself. . . . We discussed the rate you should

receive for looking after the stock on pasture, which was left open until my return to the ranch which will be Saturday June 10th and after giving this due consideration I feel 25% of the total pasture bill should be O. K. . . . We also agreed at that date that you were not to expect a lease or go any farther than plant the 12 sacks of potatoes I sent over last week.''

. Following the receipt of this letter, and on June 10th or 11th, Spencer went to the ranch, and he and Holman had a conversation while on the back porch of the house. Holman says:

''I just told him I wouldn't take twenty-five per cent, we had made arrangements as to one-half, I said I had made arrangements with Fay for a half.''

Spencer says, and in this he is corroborated by other testimony, that Holman became very angry at the twenty-five per cent provision of the letter and said that he would leave the place, or something to that effect. June 12th, Spencer wrote Holman another letter in which he said:

''I am very sorry you declined my offer in taking care of the stock on my ranch June 11th, 1933 of our last meeting. However, you know best. This letter is a notice to you that you are not to represent me or my ranch in any way, shape or form. . . .''

The trial court found:

''That said lease provided in part that said plaintiff was to cut and harvest the first crop of hay on said ranch and was to receive as his share one-half thereof; . . .''

and

''That it was also agreed by and between said plaintiff and said Spencer as part of said lease, that the plaintiff was to have charge of the pasture lands on said ranch during the season of 1933 and was to take in for pasturage, stock belonging to other parties, and was to receive one-half of the proceeds or moneys received for pasturing said stock.''

There is no controversy here over the oats or the potatoes, but the question is whether Holman was to receive one-half of the income from the pasture land and have the right to harvest the hay and get one-half of the proceeds of that. With reference to the pasture land, Holman testified that, prior to the time he received the letter of June 8th, he and Spencer had reached no agreement as to that. The testimony by Holman, in part, on that question is as follows:

"Q. You said this morning you would agree on that the next time Mr. Spencer came over? A. It was left open; I told him I wanted a half; the deal was made with Fay. Q. So far as you know it was left open, so far as Spencer was concerned? A. Yes."

From this, it appears definitely that Holman had no agreement with Spencer as to the pasture land.

With reference to the hay land, Holman testified as follows:

"Q. Mr. Holman at the time that you talked with Spencer before he wrote that letter, did you say anything about the hay land to him? A. Yes I did. Q. Was there any conversation about the hay? A. Yes I told him, he and Fay and I and young Holt walked down through the hay field. Q. What was said at that time—was that the day that Mr. Spencer left for Seattle just before he wrote that letter of June 8th? A. Yes, it was before that. . . . Q. What was said about it? A. We were talking about the hay, how much would be on there per acre; he said it was pretty light. I said it was at the present time and told him it would go about two tons, that there would be a hundred ton altogether. Q. Did you at that time say anything to him that you were going to cut the hay? A. He told me at that time to figure on the hay. Q. Just what was said? A. He told me I had the place, to run the place just as though it was my own."

Artie Holt, who, Holman says, was present at this time, testified:

"Q. I wish you would tell the court briefly what you heard? A. Holman asked him if he could go ahead with the place; he wanted the house but they wouldn't give him the house, but they told him to go ahead with the place and do anything with it he wanted to. Q. Was Mr. Fay there? A. Yes. Q. Was Mr. Spencer there? A. He was at one time. Q. The time Spencer was there did you hear Fay tell Holman to go ahead with the place? A. Not that I recall. Q. Did you hear Spencer say anything to Holman about the place? A. Not that I remember. Q. You did hear Fay tell Holman to go ahead with the place? A. Yes. . . . Q. Do you remember the time when you and Holman and Spencer and Fay walked down through the hay-field? A. Yes. Q. Do you remember when that was? A. During the time we were putting in the oats. Q. Was there anything said at that time about Holman having one-half the hay or any part of the place? A. Not that I remember."

Both Spencer and Fay categorically deny that there was any agreement made with Holman by which he was to have one-half of the proceeds of the pasture land or was to have anything to do with the harvesting of the hay. The letter of June 8th, which purports to set out Spencer's understanding of the agreement, clearly refers to crops that were to be planted and harvested for which Spencer was to furnish the seed and receive one-half of the first crop. There is nothing in this letter that makes any reference to the hay land. The conversation that took place after Holman had received the letter was with reference to the provision therein for twenty-five per cent of the receipts from the pasture land. That, apparently, was the only thing in the letter that Holman objected to. It would seem that, if he had an agreement by which he was to harvest the hay and get one-half of the proceeds thereof, it would have been mentioned by him at this time.

But it is said that the agreement with reference to

the pasture land and the hay was not made with Spencer, but with Fay. There is no evidence in the record, as we understand it, from which it can be found or reasonably inferred that Fay had any authority as the agent of Spencer to bind the latter, without his approval, with reference to any agreement pertaining to the farm. The statements of Holman to the effect that Spencer would back up Fay in everything and that he was to run and manage the place as his own would be equivalent to giving him a lease of the place, and in the letter of June 8th it was expressly said that you "were not to expect a lease or go any farther than plant the 12 sacks of potatoes I sent over last week."

The findings of the trial court with reference to the two matters for consideration are, to some extent, in the nature of conclusions, and we are not in accord therewith. It is not reasonable to believe that a man of business affairs, owning a ranch of more than three hundred acres, would say to a stranger upon their first meeting that he would back up everything that his supposed agent had said without any discussion as to the details thereof. The testimony of the witness Holt, called by Holman, does not support him. The inference from the letter of June 8th and his conduct with reference thereto is against his position. Holman's testimony with reference to his conversation with Spencer concerning the pasture land is inconsistent with his position that he had a prior binding agreement relative thereto with Fay. There is little, if anything, to support his contention with reference to the two items in controversy, except his own testimony. As we view the record, the preponderance of the evidence, when it is all considered and weighed, is against the view that Holman had acquired any right to fifty per cent of the proceeds of the pasture land or the right to harvest the hay and divide the proceeds thereof.

██ At the conclusion of his brief, the respondent makes a motion that the statement of facts be stricken, which appears to be based on the assumption that the sureties on the temporary injunction bond were, in effect, parties to the proceeding, and were entitled to have notice of the filing of the statement of facts served upon them, which was not done. There is, however, no merit in the motion. No judgment could be entered against them without a hearing, which would involve the determining of the amount. The signers of the temporary injunction bond did not, by reason of their suretyship, become parties to the action. The case of *Shippen v. Shippen,* 91 Wash. 610, 158 Pac. 247, is not here applicable.

The judgment will be reversed, and the cause remanded for further proceedings in harmony with this opinion.

BEALS, C. J., STEINERT, MILLARD, and MITCHELL, JJ., concur.